Filed 10/15/13  P. v. Sanchez CA2/24

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B241795 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA079277) |
| v. | |
| GARY ANTHONY SANCHEZ, JR., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dorothy L. Shubin, Judge.  Affirmed.

Charlotte E. Costan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Susan Sullivan Pithey and Shawn McGahey Webb, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Gary Anthony Sanchez, Jr., appeals from a judgment following his convictions for first degree murder and two assaults with a semiautomatic firearm. He contends the trial court erred (1) when it denied his *Wheeler* motions,[1] (2) when it determined that he had impliedly waived his *Miranda* rights,[2] and (3) when it admitted evidence that he previously owned a .380-caliber handgun. He also contends that he did not receive a fair trial because of the cumulative effect of the trial court's errors. Finally, he contends the evidence was insufficient to sustain two of his convictions. Finding no reversible error, we affirm.

## PROCEDURAL BACKGROUND

In an amended information, appellant and four codefendants[3] were charged with the murder of Jason Gentile (Pen. Code, § 187, subd. (a); count 1),[4] the willful, deliberate and premeditated attempted murder of Cassie Yeats (§§ 664/187, subd. (a); count 2), and the assault of Yeats with a semiautomatic firearm (§ 245, subd. (b); count 7). The information further alleged that during the commission of counts 1 and 2, a principal to the offense, specifically appellant,

---

[1]     *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

[3]     The four codefendants were Daniel Angelo Gomez, also known as (aka) "Duke," Marcos Rodriguez Garcia, aka "Tank," Walter Jason Vargas, aka "Ghost," or Jason Vargas, and Michael Anthony Vargas, aka "Mikey." Only Gomez and appellant proceeded to trial. According to the prosecutor, Jason and Michael Vargas fled to Costa Rica shortly after the homicide and police were unable to locate them. The case against Garcia was severed from the instant case. At the end of the presentation of evidence but before submission to the jury, Gomez accepted a plea deal.

[4]     All further statutory citations are to the Penal Code, unless otherwise stated.

personally used and intentionally discharged a firearm causing great bodily injury or death to the victims (§ 12022.53, subds. (b), (c), (d) & (e)(1)).  As to count 7, it was alleged that appellant personally used a firearm (§ 12022.5), and that he and three of his codefendants personally inflicted great bodily injury upon the victim. (§ 12022.7, subd. (a).)  In addition, appellant was charged with the assault of Ashley Booth with a semiautomatic firearm (§ 245, subd. (b); count 3), and the attempted willful, deliberate and premeditated murders of Michael R., Joseph F. and Jason M. (§§ 664/187, subd. (a); counts 4, 5, & 6).  Finally, it was alleged that all seven offenses were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).

After appellant pled not guilty and denied all the allegations, the trial court granted the prosecution's motion to dismiss count 2.  During voir dire, the trial court denied several *Wheeler* motions.  The court also granted in part and denied in part appellant's motion to suppress his pretrial statement, which he contended was obtained in violation of his *Miranda* rights.

The jury found appellant guilty of first degree murder (count 1) and assault with a semiautomatic firearm (counts 3 and 7), and determined that the special allegations attached to those counts were true.  The jury found appellant not guilty of counts 4, 5 and 6.[5]

The trial court sentenced appellant to state prison for 59 years and 4 months to life, with a 15-year parole eligibility minimum.  Appellant timely filed a notice of appeal from the judgment.

---

[5]    These counts charged appellant with shooting at the three victims with a .380-caliber handgun.  Because appellant was acquitted of these counts, we omit further details of this shooting.

# FACTUAL BACKGROUND

Fred Zamora and Arturo Ayon were next-door neighbors in Monrovia. Late in the afternoon of December 15, 2009, Zamora hosted a party to celebrate Ayon's birthday. Initially, the group consisted of Ayon and his girlfriend, Megan McIntire, and Zamora and his roommate, Myrna, and her 10-year-old son. Early that evening, a large number of people arrived in a van. The group included appellant and his codefendants. McIntire had met appellant several days before and had seen him several times. An hour later, Ashley Booth and Desiree Delgado, McIntire's acquaintances, also showed up. They parked in the driveway behind the van, and McIntire took them inside Zamora's house.

About 15 minutes later, McIntire exited Zamora's house and headed to Ayon's to get a jacket. She saw a group of men that included appellant standing between the two houses. Some members of the group, including appellant, Jason, Mikey and Garcia, walked to a nearby street intersection. Gomez followed, but stopped halfway down the street and came back toward the house. McIntire thought the men were leaving. She went into Ayon's house, got her jacket, and went back outside.

A few minutes after McIntire left to get her jacket, Booth went outside to have a cigarette. She saw appellant and his codefendants outside. Delgado followed Booth outside, and the women talked to Gomez. The other men walked to a nearby area to smoke marijuana.

Meanwhile, Jason Gentile and his girlfriend, Cassie Yeats, were walking home from a nearby gym. When Gentile and Yeats reached the intersection near Zamora's house, a group of men quickly approached them. Yeats noticed that one of the men, whom she later identified as appellant, had a gun. She stopped moving, and both she and Gentile backed away from the men. While Gentile and

4

the gunman spoke to one another, the other men spread out in a half circle around them.  Appellant claimed membership in a Monrovia gang, and asked Gentile where he was from.  Gentile responded that he was from Anaheim.  Another person said something like, "Pop his ass," "Just bust him," or "Just hit him."  In response, someone said, "I don't play with fists.  I play with guns."  Seconds later, appellant pointed the gun at Gentile.  Someone said, "Finish it off.  Get it done." Appellant fired.  Gentile grabbed his chest, looked back at Yeats, and then fell to the ground.  Appellant fired about five more shots at Gentile.  One of the bullets struck Yeats in the foot.  Appellant and the rest of the group ran back toward Zamora's house.  Yeats called 911 from her mobile phone.

McIntire observed the incident and identified appellant as the shooter. Although it was dark outside, a nearby streetlight provided illumination.   McIntire had a clear view and was 100 percent certain that appellant was the shooter.

Booth and Delgado heard the gunshots but did not see the shooting.  They took Booth's son and ran to Myrna's bedroom to hide, but Myrna yelled at them to leave.  They went outside to their car, but Booth could not find the car keys. Appellant and his codefendants ran up the driveway to their van.  Booth dumped the contents of her purse onto the grass to find the car keys.  Someone started yelling at her, "Move your fucking car, bitch."  The same person repeatedly yelled, "Bitch, move your car."  Another person told her to "Hurry up and find your keys." Booth was on her knees on the grass, desperately trying to find the car keys.  Booth looked up and saw appellant, who was five to six feet away, pointing a gun at her. Booth finally found her keys and moved her car into the street.  Appellant, Jason and Mikey left in the van.  Gomez went inside the house, and Garcia started walking away from the house.

Gentile died at the scene. He suffered multiple gunshot wounds. Underneath his right arm, a coroner's investigator recovered a live unfired .380-caliber round. A firearms examiner analyzed the seven casings, two expended bullets and live unfired round recovered from the shooting. He determined that they had been fired from the same .380-caliber semiautomatic weapon. Further, the live unfired round had been cycled through the same weapon; it likely misfired and was manually ejected by the shooter.

Robert Martindale, a sergeant with the Los Angeles County Sheriff's Department, was assigned to investigate the shooting. Evidence found near Zamora's driveway -- women's cosmetics and a piece of paper -- led him to Booth. When he interviewed Booth, she told him what she knew of the incident and suggested that he talk to McIntire. Sergeant Martindale subsequently interviewed McIntire. Although McIntire was initially deceptive, she eventually acknowledged that she saw appellant commit the shooting.

After interviewing McIntire, Sergeant Martindale returned to the scene of the shooting. He determined that it was 175 feet from where Gentile's body was found to where McIntire had been standing. Sergeant Martindale also determined that McIntire's vision would not have been obstructed.

When Sergeant Martindale interviewed Yeats, she told him that the assailants were all Hispanic males around the same height. The shooter had a medium build and was 5'7" to 5'8" tall. Yeats could not identify appellant or any of the codefendants from photographs shown to her. At the preliminary hearing, Yeats stated that she believed that appellant was present at the shooting, but she could not remember whether he was the shooter. At trial, she testified that she believed appellant was the shooter. Yeats explained that over the last few days,

she had "done nothing but remember" the shooting, and she recalled appellant as the shooter.

Sergeant Martindale and his partner, Sergeant MacArthur, interviewed appellant after his arrest. During the interview, Sergeant MacArthur told appellant, "We know that you were there with five guys. You surrounded this white boy and his girlfriend on the sidewalk. And you pulled out a fuckin' .380 and you lit him up like a Christmas tree." Appellant denied being involved. After appellant admitted he had purchased a .380-caliber weapon in 2005, the sergeant stated that it was "going to look bad" because appellant liked .380-caliber firearms.

Monrovia Police Officer Yolanda Gutierrez testified as the prosecution's gang expert. She knew appellant, and opined that he was an active member of Monrovia Nuevo Varrio (MNV), a criminal street gang. She stated that Jason Vargas was a documented member of MNV. Officer Gutierrez also opined that Gomez was a member of MNV, because he associated with MNV gang members and had several MNV tattoos. When presented with a hypothetical based on the facts of this case, Officer Gutierrez opined that the shooting and assaults were committed for the benefit of MNV. The shooting and assault benefited MNV by instilling fear in the community. Fear enhanced the gang's reputation and enabled it to commit future crimes without interference.

Appellant sought to create reasonable doubt about Yeats's identification of him as the shooter. Vivian Fang, a close family friend, estimated that on December 15, 2009, appellant was over six feet tall and weighed more than 300 pounds.

## DISCUSSION

Appellant contends the judgment of conviction should be reversed because: (1) he was denied his right to a jury drawn from a representative cross-section of

7

the community, as the trial court erred in denying two *Wheeler* motions; (2) he was denied his right to remain silent during custodial interrogation, as the court erred in determining that he impliedly waived his *Miranda* rights; (3) the court erred in admitting evidence that he previously owned a .380-caliber handgun, as that evidence was inadmissible character evidence; and (4) the cumulative effect of the trial court's errors deprived him his right to a fair trial. Appellant also contends that the evidence was insufficient to support two of his convictions.

A.    *Wheeler* Motions

Appellant contends the trial court erred in denying two *Wheeler* motions, because, he argues, the prosecutor improperly used peremptory challenges to excuse five Hispanic prospective jurors: Nos. 5166, 3463, 6279, 9803, and 3040. The record fails to support appellant's argument.

1.    Relevant Background

During jury selection, the prosecutor used her second peremptory challenge against prospective Juror No. 5166, a school counselor whose husband had some law enforcement training. Her third peremptory was against prospective Juror No. 3463, a woman who worked as a courtroom assistant. One of prospective Juror No. 3463's children was a clerk at the same courthouse, her husband was a retired deputy sheriff, and two of her children were peace officers.

After the defense exercised its third peremptory challenge, the prosecutor accepted the panel. Three Hispanics were on the panel. The defense used its fourth peremptory, and the prosecutor then excused prospective Juror No. 6279, a male college student. At that point, the defense made a *Wheeler* motion, asserting that the last three prospective jurors dismissed by the prosecutor all appeared to be Hispanic.

The court found a prima facie case had been made and asked the prosecutor to state her reasons for excusing the prospective jurors. With respect to Juror No. 5166, the school counselor, the prosecutor explained, "I usually don't like to keep counselors, especially school counselors, on the jury. They're usually overly sympathetic towards defendants." In excusing prospective Juror No. 3463, the courtroom assistant, the prosecutor referred to her answers in voir dire and stated, "She's too much on the inside . . . being a courtroom assistant. Usually, I don't like people in the legal profession, especially people who work inside the courtroom." Finally, the prosecutor explained that she excused prospective Juror No. 6279, the student, because she did not think he would be a good juror if he was worried about missing class. She thought she was doing him a favor by using a peremptory to release him.

Defense counsel accepted the prosecutor's reason for excusing prospective Juror No. 5166, the school counselor. However, they asserted that prospective Juror No. 3463's connection to law enforcement made her an acceptable prosecution juror, and that prospective Juror No. 6279 seemed eager to serve on a jury.[6]

The trial court denied the motion. It found that the defense had conceded the legitimacy of the prosecutor's explanation for excusing Juror No. 5166. As to prospective Juror No. 3463, the court stated that the prosecutor had articulated reasons that pertained to the juror's occupation and her particular responses to questions. Finally, as to prospective Juror No. 6279, the court found it

---

[6]     Appellant's opening brief mistakenly asserts that the defense accepted the prosecutor's explanation for excusing prospective Juror No. 6279. The reply brief asserts for the first time that the explanation was pretextual. Although we need not consider arguments made for the first time in a reply brief, we exercise our discretion to do so here.

understandable that the prosecutor did not want someone on the jury whose mind would be on other things. The court viewed the juror as willing to serve, but not eager.

The parties continued to exercise their peremptory challenges. After the defense's seventh peremptory challenge, the prosecutor accepted the panel. There were still Hispanics on the panel. The defense continued to use their peremptory challenges, and the prosecutor excused two prospective jurors. After defense counsel used their 10th peremptory, the prosecutor used her ninth to excuse prospective Juror No. 3040. This prospective juror admitted that he was not a good listener and that he had "been known to forget quite a couple of things here and there." Serving on the jury, he said, would be "a challenge." In addition, he had a grandfather who had been arrested for assaulting a police officer, and an uncle serving time for murder in Mexico.

The prosecutor used her 10th peremptory to excuse prospective Juror No. 9803. This prospective juror had a brother and uncles who had been arrested, and his girlfriend had pled guilty to witness tampering. Further, while growing up, he had been harassed by police officers in gang units.

The defense made another *Wheeler* motion based on the prosecutor's dismissal of prospective Juror Nos. 3040 and 9803. The court indicated that a prima facie showing had been made. The prosecutor objected, pointing out that she had twice accepted the panel with Hispanic members. She then explained that she excused prospective Juror No. 9803 because his brother and uncles had been arrested, his girlfriend had been arrested for witness intimidation, and he had been harassed by gang officers. She did not "want a juror who has been harassed in the past by officers in the gang unit." As for prospective Juror No. 3040, the prosecutor noted that the juror had indicated he would have a difficult time

10

following the witnesses' testimony.  Further, he seemed very young, and lacked the maturity to be a juror.  Defense counsel did not argue.  The court denied the *Wheeler* motion, finding the prosecutor credible and her reasons race neutral.

> 2.     Analysis

"The purpose of peremptory challenges is to allow a party to exclude prospective jurors who[m] the party believes may be consciously or unconsciously biased against him or her.  [Citation.]  However, the use of peremptory challenges to remove prospective jurors from the panel solely on the basis of group bias violates the right of the defendant to a jury drawn from a representative cross-section of the community.  [Citations.]" (*People v. Jackson* (1992) 10 Cal.App.4th 13, 17-18, italics & fn. omitted.)  "[A] peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality[,] . . . rang[ing] from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*Wheeler*, *supra*, 22 Cal.3d at p. 275; accord *People v. King* (1987) 195 Cal.App.3d 923, 933.)

Trial courts engage in a three-step process to resolve claims that a prosecutor  used peremptory challenges to strike prospective jurors on the basis of group bias -- that is, bias against "'members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds.'" (*People v. Avila* (2006) 38 Cal.4th 491, 541.)  "First, the defendant must make out a prima facie case 'by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.'  [Citation.]  Second, once the defendant has made out a prima facie case, the 'burden shifts to the State to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, '[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial

11

discrimination.' [Citation.]" (*Johnson v. California* (2005) 545 U.S. 162, 168, fn. omitted.) The appellate court reviews the trial court's ruling on the question of purposeful racial discrimination for substantial evidence, presumes that the prosecutor used peremptory challenges in a constitutional manner, and gives deference to the trial court's conclusions, as long as the "court makes 'a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.'" (*People v. Avila*, *supra*, 38 Cal.4th at p. 541, quoting *People v. Burgener* (2003) 29 Cal.4th 833, 864.)

After examining the record, we conclude that the trial court made "a sincere and reasoned effort" to evaluate the prosecutor's proffered reasons for excusing the five Hispanic prospective jurors. Here, "[t]he prosecutor's stated reasons for exercising each peremptory challenge [were] neither contradicted by the record nor inherently implausible." (*People v. Ward* (2005) 36 Cal.4th 186, 205.) As to prospective Juror No. 5166, the school counselor, defense counsel agreed that the reason was legitimate and on appeal, appellant does not argue otherwise.

As to prospective Juror No. 6279, the student, the prosecutor's stated reason -- her concern that he would worry about missing school -- was race neutral. (See *People v. Reynoso* (2003) 31 Cal.4th 903, 925-926 (*Reynoso*) [excusal of distracted prospective juror is race-neutral].) Similarly, the prosecutor's proffered reason to excuse prospective Juror No. 3463 -- that she was a courtroom assistant -- was race neutral. (See, e.g., *People v. Mai* (2013) 57 Cal.4th 986, 1052-1053 [prosecutor could excuse prospective juror who was a 911 operator for police department because of her demeanor and voir dire response]; *People v. Clark* (2011) 52 Cal.4th 856, 1013 [prosecutor could excuse prospective juror, a legal professional, because other jurors may ascribe to her special legal expertise].)

12

As to prospective Juror No. 9803, the prosecutor explained that she excused him because he had been harassed by police when he was younger, had family members who had been arrested, and had a girlfriend who had pled guilty to witness tampering. These were race-neutral grounds to exclude the prospective juror. (See, e.g., *People v. Douglas* (1995) 36 Cal.App.4th 1681, 1690 ["[U]se of peremptory challenges to exclude prospective jurors whose relative and/or family members have had negative experiences with the criminal justice system is not unconstitutional."].)

As to prospective Juror No. 3040, the prosecutor stated she excused him because he admitted he was not a good listener, seemed very young, and in the prosecutor's opinion, lacked maturity. These were race-neutral reasons. (See, e.g., *People v. Sims* (1993) 5 Cal.4th 405, 429-430 [prosecutor could exclude prospective juror who was "a youthful college student with insufficient maturity," and another prospective juror who was "very young and appeared immature"].) In addition, the record shows that the prospective juror had an uncle serving time for murder. (See, e.g., *People v. Dunn* (1995) 40 Cal.App.4th 1039, 1052-1053 [prosecutor properly challenged juror whose uncle had been convicted of murder].)

The trial court found the prosecutor's proffered reasons to be race-neutral and credible. Nothing suggests that the proffered reasons were pretextual. The prosecutor repeatedly accepted panels with multiple Hispanic jurors, and offered rational, credible explanations for the exercise of her peremptory challenges. (*Reynoso*, *supra*, 31 Cal.4th at p. 926 [fact that prosecutor accepted a jury with two Hispanic members suggests that prosecutor did not have an unconstitutional discriminatory intent against Hispanics].) In short, we discern no error in the trial court's denial of appellant's *Wheeler* motions.

13

B.       Implied Waiver of *Miranda* Rights

Appellant next contends the trial court erred in denying his motion to suppress the entirety of a nine-minute tape-recording of a police interview.  He contends all of his statements in the interview were obtained in violation of *Miranda*.  As explained below, we disagree.

1.       Relevant Background

During their investigation into the shootings, Sergeants Martindale and MacArthur interviewed appellant.  In the interview, which was played for the court, appellant was advised of his *Miranda* rights as follows:

> "MacArthur:  All righty.  Well, obviously you're in jail so -- so we got to read you your rights.
>
> "[Appellant]:  Yeah.
>
> "MacArthur:  We got a card.
>
>  . . . .
>
> "Martindale:  I'll do that and then we can -- we can discuss what's going on.  And --
>
> "MacArthur:  We'll -- We'll tell you --
>
> "Martindale:  -- we'll explain it and then we can talk back and forth.  Okay.
>
> "[Appellant]:  Okay.
>
> "Martindale:  All right.  Um, first of all, not to be, ah, rude or anything but you understand English?
>
> "[Appellant]:  Yeah.
>
> "Martindale:  Okay.  I ask that because some people do and then they have difficulty, you understand?
>
> "[Appellant]:  Yeah.
>
> "Martindale:  Okay.  Um, you have the right to remain silent.

14

"[Appellant]: Uh-huh.

"Martindale: And anything you say may be used against you in court. You have the right to an attorney during questioning. If you cannot afford an attorney, one will be appointed for you before any questioning. Okay?

"[Appellant]: Uh-uh.

"Martindale: All right. Any questions, anything?

"[Appellant]: I just --

"Martindale: Okay.

"[Appellant]: -- don't know what it's about.

"Martindale: Okay. Okay."

Sergeant Martindale then explained that appellant had been identified as being involved in a murder in Monrovia. After some further discussion, appellant said, "I'd just rather speak to an attorney." The interview continued for a few minutes and then terminated.

At the suppression hearing, Sergeant Martindale admitted never asking appellant whether he understood his rights or whether he wished to waive his right to counsel before discussing the murder. Because Sergeant Martindale failed to do so, appellant argued he never expressly waived his *Miranda* rights. Appellant further argued that his responses when read his rights -- "uh-huh" -- did not constitute an implied waiver. Finally, he asserted that even if he initially waived his rights, he subsequently invoked them by stating he would rather speak to an attorney.

The trial court determined that the totality of circumstances established that appellant understood and impliedly waived his *Miranda* rights, as he started talking and answering questions immediately after the advisement of rights. However, the court agreed that appellant had invoked his right to counsel by

15

stating he would rather speak to an attorney. Accordingly, the court excluded all statements made after that point.

> 2. Analysis

In reviewing a trial court's ruling on a motion to suppress, an appellate court applies two different standards of review. The reviewing court defers to the trial court's findings of fact, both express and implied, if supported by substantial evidence. The reviewing court then independently applies the pertinent legal principles to those facts to determine whether the motion should have been granted. (*People v. Carter* (2005) 36 Cal.4th 1114, 1140.)

Under *Miranda*, statements obtained during custodial interrogation may be used at trial only if the defendant has been given certain advisements. (*Miranda*, *supra*, 384 U.S. at p. 444.) Once a suspect receives the advisements, he "is free to exercise his own volition in deciding whether or not to make a statement to the authorities." (*Oregon v. Elstad* (1985) 470 U.S. 298, 308.) A waiver of the right to remain silent may be express or implied from the totality of circumstances, including the suspect's actions and words. (*Berghuis v. Thompkins* (2010) 560 U.S. 370 [130 S.Ct. 2250, 2261-2264] (*Berghuis*); *People v. Whitson* (1998) 17 Cal.4th 229, 244-250.)

Here, *Miranda* advisements were given, and the totality of the circumstances shows that appellant understood his rights. Appellant stated that he understood English, and he responded affirmatively to the various advisements. Moreover, nothing suggests that appellant was coerced into making his statements. The entire interview lasted less than 10 minutes, and the officers used no "physical or psychological pressure to elicit statements from [him]." (*People v. Whitson*, *supra*, 17 Cal.4th at p. 249.) Rather, as noted by the trial court, appellant promptly started speaking after being advised of his *Miranda* rights. "Where the prosecution shows

16

that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis*, *supra*, 130 S.Ct. at p. 2262.) Accordingly, the trial court properly determined that appellant had impliedly waived his right to remain silent until he subsequently invoked his right to counsel.

C.     Evidence of Prior Gun Ownership

Appellant next contends the trial court erred in admitting evidence of his prior ownership of a handgun that was not used in the shooting. We disagree.

1.     Relevant Background

During the tape-recorded police interview, the following exchange regarding appellant's prior ownership of a .380-caliber handgun occurred:

"MacArthur:  And -- And everybody says it's you. You bought a .380 in 2005, right?

"(Crosstalk)

"[Appellant]:  _____

"MacArthur:  Brand new.

"[Appellant]:  Yeah.

"MacArthur:  In El Monte, somebody supposedly took it away.

"[Appellant]:  Yeah.

"MacArthur:  All right. Um, where's that gun now, do you know?

"[Appellant]:  In El Monte _____

"MacArthur:  Okay. So you like .380s, so that's going to look bad.

"[Appellant]:  Oh --

"MacArthur:  All right.

"[Appellant]:  -- you guys are trying to pin this shit on me.

"MacArthur:  No, we're not trying to pin it on -- we have pinned it on you.

17

At the suppression hearing, appellant argued that the foregoing was irrelevant and more prejudicial than probative under Evidence Code section 352, as the handgun was not in his possession at the time of the shooting. He also contended the evidence was "a specific instance of conduct which is inadmissible" under Evidence Code section 1101. The trial court found the evidence that appellant previously owned a .380 relevant and probative, as there had been "a lot of testimony" that the murder weapon was a .380, and his prior purchase tended to show his preference for that particular caliber of handgun. The court disagreed that the evidence was inadmissible under Evidence Code section 1101, and suggested that counsel formulate a stipulation to clarify that the weapon appellant owned was not the murder weapon.

The recording of appellant's statements was later played for the jury. Sergeant Martindale testified that the .380 handgun appellant acknowledged having previously owned was in the custody of the El Monte Police Department at the time of the shooting.

2.      Analysis

Appellant contends that the evidence of his prior gun ownership was irrelevant and unduly prejudicial under Evidence Code section 352, and that it was inadmissible character evidence under Evidence Code section 1101. We disagree.

First, the evidence was more probative than prejudicial, as it showed that appellant had a preference for the same type of handgun that was used to commit the charged offenses. The evidence was not unduly prejudicial, as the jury was informed that appellant's previously owned handgun was not the weapon used to commit the charged offenses. Indeed, the jury knew appellant did not have possession of the handgun at the time of the shooting.

18

Second, the evidence was not inadmissible character evidence under Evidence Code section 1101, subdivision (a). Prior gun ownership does not prove that the gun owner has a propensity to commit assault or murder. Nor was the evidence inadmissible under Evidence Code section 1101, subdivision (b), which prohibits evidence of prior misconduct to show disposition. The evidence admitted was that appellant previously bought a .380 handgun that had been taken away by someone in El Monte, and later placed with the El Monte Police Department. No evidence was admitted suggesting that appellant illegally possessed the handgun or was guilty of some other misconduct related to his prior gun ownership. Accordingly, the evidence of appellant's prior gun ownership falls outside the purview of Evidence Code section 1101. In short, the trial court did not err in denying appellant's motion to suppress evidence that he previously owned a .380 handgun.

Moreover, even had the trial court erred, we would find any error harmless under *People v. Watson* (1956) 46 Cal.2d 818. Although all of the charged offenses were alleged to have been committed with a .380-caliber handgun, the jury acquitted appellant of three counts. As to his three convictions, McIntire and Yeats identified appellant as the person who shot and killed Gentile. Yeats also testified that she was injured by appellant's shots. Booth identified him as the person who, seconds after Gentile's murder, pointed a gun at her and called her "bitch." On this record, it was not reasonably probable that a result more favorable to defendant would have been reached, absent the admission of evidence that appellant previously owned a .380-caliber handgun. (*Id*. at p. 837.)[7]

---

[7] Inexplicably, appellant's counsel suggests that by arguing that any error was harmless, the People have "implicitly conced[ed]" the merits of appellant's arguments. The People's argument that if any error occurred, it was harmless, is

19

D.    Cumulative Error

Appellant contends that cumulative error requires the reversal of his convictions.  As we have determined there were no errors, there is no cumulative error.  (*People v. Jones* (2013) 57 Cal.4th 899, 981.)

E.    Sufficiency of the Evidence

Appellant concedes there was sufficient evidence to sustain his conviction for assaulting Booth.  He contends, however, that the evidence was insufficient to support his convictions for the first degree murder of Gentile and the assault of Yeats.  According to appellant, his identification as the shooter by Yeats and McIntire was not credible or reliable.

"In determining whether the evidence is sufficient to support a conviction . . . , 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.]  Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.]  Rather, the reviewing court 'must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.)  "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.]  Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the

_____

no more a concession that the trial court erred than is this court's discussion of harmless error.

20

trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

Here, McIntire, who knew appellant, was 100 percent certain that he was the shooter. Appellant argues that McIntire was mistaken because of the darkness and her distance from the crime scene. The evidence suggests the contrary. First, a nearby streetlight illuminated the crime scene. Second, Sergeant Martindale determined that it was 175 feet from McIntire's position to the crime scene, and that the view was unobstructed. Thus, McIntire's identification was neither "physically impossible [n]or inherently improbable." As such, the jury was entitled to rely on it. (*People v. Young*, *supra*, 34 Cal.4th at p. 1181.)

Yeats also identified appellant as the shooter. Appellant contends that Yeats's identification was unreliable. He notes that Yeats previously stated that the shooter was 5'7" to 5'8" tall and had a medium build, whereas a defense witness testified appellant was over six feet tall and weighed over 300 pounds at the time of the shooting. Yeats never selected appellant's picture out of a photographic array, and identified him as the shooter only at trial. Even if Yeats's identification was questionable, however, the credibility of her testimony and the weight of the identification were for the jury to decide. (See *People v. Lindsay* (1964) 227 Cal.App.2d 482, 494-497 [inconsistencies between victims' descriptions of assailant and defendant's actual appearance at trial and fact that one victim identified defendant at trial but could not do so at lineup went to weight of evidence, which is left to the jury to determine in the first instance]; cf. *People v. Marquez* (2000) 78 Cal.App.4th 1302, 1306-1307 [evidence sufficient to support defendant's robbery conviction despite physical differences between himself and three witnesses' description of the robber].) Moreover, the jury was entitled to

conclude that the person who shot Gentile and Yeats was the same person who, literally seconds later, pointed a gun at Booth. Appellant does not dispute that he was that person. In short, appellant's convictions were supported by substantial evidence.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.

22